# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION

| | |
|---|---|
| KENNETH J. MYNATT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> OFFICE OF LABOR MANAGEMENT ) <br> STANDARDS OF THE UNITED STATES ) <br> DEPARTMENT OF LABOR, ) <br> ) <br> TREASURY INSPECTOR GENERAL FOR ) <br> TAX ADMINISTRATION, ) <br> ) <br> Defendant. ) <br> ) | Case No._____ |

## COMPLAINT

Comes now, Kenneth J. Mynatt (hereinafter "Plaintiff"), by and through undersigned counsel, and for Complaint against the United States of America, Office of Labor Management Standards of the United States, Department of Labor, and Treasury Inspector General for Tax Administation (hereinafter "Defendants"), and would respectfully show unto this Court the following:

### **PARTIES**

1. The PLAINTIFF, Kenneth J. Mynatt resides at 8671 Del Rio Drive, Smyrna, TN 37167, and thus is a resident of the Middle District of Tennessee.

2. The Office of Labor Management Standards of United States Department of Labor (hereinafter "OLMS") and the Treasury Inspector General for Tax Administration (hereinafter "TIGTA") are administrative agencies of the United States of America.

## JURISDICTION AND VENUE

3. The claims herein are brought against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §§1346(b)(l) (hereinafter "FTCA"), for money damages as compensation for loss of property and personal injuries that were caused by the negligent and wrongful acts and omissions of employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the PLAINTIFF in accordance with the laws of the State of Tennessee.

4. Venue is proper in that all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the Middle District of Tennessee, and arose from the filing and prosecution of unfounded charges of criminal conduct against PLAINTIFF by the United States Government and its agents, maliciously and without probable cause, in State of Tennessee v. Kenneth J. Mynatt, 20th Judicial District of Tennessee, Case Number 2014-A-646.

5. PLAINTIFF has fully complied with the provisions of 28 U.S.C. §2675 of the Federal Tort Claims Act.

## FACTS

6. Kenneth J. Mynatt, Jr. was maliciously prosecuted in State of Tennessee v. Kenneth J. Mynatt, 20th Judicial District of Tennessee, Case No. 2014-A-646 at the suggestion and

instigation of special agents of the Office of Labor Management Standards of United States Department of Labor (hereinafter "OLMS") and special agents of the Treasury Inspector General for Tax Administration (hereinafter "TIGTA"), including but not limited to the following employees:

OLMS Special Agents - Scott Kemp, Sonya Ewing, Joyln Underwood, and Craig Neel

TIGTA Special Agents - Gary Mappin and Patrick Mayes

7. Special agents KEMP, EWING, UNDERWOOD, NEEL are special agents of OLMS, while MAPPIN and MAYES are agents of TIGTA and are "investigative or law enforcement officers" within the meaning of 28 U.S.C. §2680(h), and thus, a claim for malicious prosecution may be pursued against the United States of America.

8. PLAINTIFF alleges, upon information and belief, the malicious conduct and false statements of the OLMS and TIGTA agents, were pursued by District Attorney's Office of the 20th Judicial District of Tennessee, based on pressure and coercion from employees of OLMS, TIGTA, and employees of the IRS and the who knew of the baseless and political nature of the allegations. If subsequent discovery proves this to be true, then the conduct of such federal employees would constitute overt acts of co-conspirators who participated in the malicious prosecution.

9. The claims of PLAINTIFF are based upon the acts and events set forth below, all of which actions were taken (and events were caused) by investigative and law enforcement officers of the United States Government while acting within the scope of their employment.

    a. The conduct and actions giving rise to these claims arose from and were based upon fabricated allegations of misconduct by Mr. Mynatt that allegedly occurred

a. while he was serving as the executive vice president of Chapter 39 of the National Treasury Employees Union (hereinafter "NTEU39"), based in Nashville, TN from October 1, 2009 until August 30, 2011.

b. The events began in or about July 2011. IRS employees, David Krieg (hereinafter "KRIEG") and John Van Atta (hereinafter "VAN ATTA"), enlisted the assistance of OLMS and TIGTA special agents, to frame the PLAINTIFF for theft from NTEU39. Beginning in 2011, they conspired together to create a false narrative and subsequent politically motivated investigation which resulted in the PLAINTIFF's indictment by a state grand jury in March 2014.

c. Thereafter, the government's OLMS and TIGTA agents, along with employees of the IRS, while acting within the scope of their employment, maliciously and without probable cause recommended and urged the filing and prosecution of federal felony charges against PLAINTIFF for alleged "theft" of union funds and "theft of government services" by sending an e-mail using the IRS network in the course of his union duties. The Department of Justice declined the OLMS and TIGTA agents' requests because they determined the alleged crimes did not occur and were political in nature.

d. This action was accomplished by TIGTA agent MAYES who contacted the local district attorney's office and setup a meeting between he, KEMP, and Assistant District Attorney (ADA) Rob Mitchell (hereinafter "MITCHELL") and ADA Jim Milam (hereinafter "MILAM") with the District Attorney General for the 20th Judicial District of TN (DA20) in early January 2014.

e. During the initial meeting, false testimony and forged documents previously generated by VAN ATTA and KEMP were presented to ADA MILAM and MITCHELL. At a second meeting not attended by MILAM, MAYES and KEMP admitted to MITCHELL they were being pressured by their respective management structures to have the PLAINTIFF indicted regardless of the facts. MAYES and KEMP admitted to MITCHELL the charges were political in nature and not based on provable facts, but they insisted PLAINTIFF would have little or no representation and would likely plead guilty if MITCHELL assisted them in overcharging and indicting the PLAINTIFF. MITCHELL was in his first few months on the job had just passed the Bar exam and was eyeing a chance to impress his superiors with an indictment of an IRS agent. He initially declined MAYES and KEMP'S requests, but finally relented after considerable pressure he later described to PLAINITFF'S attorney as "they (MAYES/KEMP) just pushed so hard to get him (PLAINTIFF)". MITCHELL finally relented and agreed to assist KEMP and MAYES in their desire to have PLAINTIFF indicted as long as either KEMP or MAYES agreed to be listed on the indictment as the "prosecutor". On March 14, 2014, MITCHELL allowed KEMP, who had the blessing of his OLMS managers UNDERWOOD and NEEL, to testify before a state grand jury and successfully had PLAINTIFF indicted for two state felonies. As previously agreed between the conspirators, KEMP signed the indictment as the prosecutor. The subsequent arrest of PLAINTIFF was the result of a grand jury indictment obtained by KEMP by knowingly using false testimony and altered documents.

f. PLAINTIFF was arrested shortly after formal felony charges were filed against him on March 14, 2014. PLAINTIFF was charged in the indictment with one (1) count of theft over $1,000 but less than $10,000 in violation of Tenn. Code Ann. §39-14-103 and one (1) count mis-use of a credit or debit card over $1,000 but less than $10,000 in violation of Tenn. Code Ann. §39-14-118. Both of these criminal statutes are classified as Class E felonies and prescribe upon conviction on each count imprisonment for a term of not less than one year and not more than six years, and a fine not greater than $3,000.

g. Before, and after the arrest, the government's special agents falsely accused PLAINTIFF of theft and misuse of a credit/debit card; and failed to provide full discovery from April 2014 until the charges were dismissed and denied the PLAINTIFF his right to view any and all evidence against him.

h. After the arrest, the government's agent, realizing allowing full discovery to the PLAINTIFF would reveal the lack of probable cause for an indictment and the malicious intent of the prosecution, asked ADA MILAM to drop all charges against PLAINTIFF if he agreed to resign his position with the Federal government. The PLAINTIFF refused repeatedly based on the fact he was innocent. Upon knowledge and belief, during this time period the government's agents were in frequent contact with IRS, OLMS, and TIGTA executives directing the political prosecution of PLAINTIFF or using KEMP and MAYES as their intermediaries.

10. Ultimately, all charges against PLAINTIFF were retired in November 2015 for twelve months and later dismissed in their entirety on November 28, 2016. The case was

dismissed because PLAINTIFF was innocent of the charges, and the Government never possessed evidence upon which PLAINTIFF could have been convicted, in that:

a. The alleged "thefts" never happened. In July 2011, KRIEG, the Chief Human Capital Officer for the IRS and VAN ATTA, who was also serving as the president of NTEU Chapter 39, found common ground in conspiring against PLAINTIFF. KRIEG, as evidenced by numerous e-mails was determined to retaliate against PLAINTIFF because PLAINTIFF blew the whistle to a member of the United States Congress about a wasteful IRS manager conference in 2010, which became the subject of Congressional hearings. KRIEG admitted in contemporaneous e-mails he knew NTEU NATIONAL was behind the scheme to have the PLAINTIFF framed for theft based on discussions he had with VAN ATTA and an attorney with NTEU. VAN ATTA, was concerned about PLAINTIFF challenging him for president of NTEU and he was also being pressure by NTEU National president Collen Kelley (KELLEY) because PLAINTIFF had been quoted in the Washington Post in June 2011, as being concerned about KELLEY'S perceived abuse of power within NTEU, and she was troubled about her ability to be re-elected to another four year term as national president in an upcoming election. It was these motivations which formed the basis for their conspiracy to claim PLAINTIFF had stolen funds from NTEU39.
b. VAN ATTA was also the bookkeeper for the local union as well as the individual who kept the local union's debit card under lock and key only accessible by him.

VAN ATTA, who was an IRS revenue agent with over twenty-five years of experience on the job and possessing a master's degree in accounting, updated the local union's books and records using QuickBooks software and online access to the union's checking and savings accounts several times each week.

c. NTEU39 did not receive dues directly from its membership, NTEU NATIONAL collected all dues, and sent NTEU39 approximately $1,000 per month to pay operating expenses, such that accounting for the financial affairs of NTEU39 was hardly a material endeavor for someone of VAN ATTA's experience and training. In addition, VAN ATTA had a certified public accountant (CPA) review the local union's books and records annually, before preparing and filing certified financial statements with both OLMS and NTEU National on an annual basis.

d. All travel on behalf of the local union by PLAINTIFF, was approved by VAN ATTA, who would retrieve the chapter's debit card from a locked cabinet and give to the PLAINTIFF to utilize for expenses incurred while performing local union business, including fuel, lodging, reimbursements to stewards, meals, and expenses related to union chapter meetings in Memphis, Nashville, Chattanooga, Knoxville, and Johnson City, TN, where the chapter had members and stewards representing those members working on behalf of the IRS. Upon return from a trip, the PLAINTIFF would submit all receipts and prepare a written travel voucher according to VAN ATTA's direction. At the end of every quarter beginning with 12/2009, VAN ATTA would prepare a "settlement statement" for PLAINTIFF'S loans to officer's account, which was established by and overseen by VAN ATTA, at which time, the chapter would owe the PLAINTIFF

reimbursement, or the PLAINTIFF would owe the chapter reimbursement, depending on the advances or expenditures made. This policy was established by VAN ATTA and in accordance with 29 U.S.C. 503, which states in part: "SEC. 503. (a) No labor organization shall make directly or indirectly any loan or loans to any officer or employee of such organization which results in a total indebtedness on the part of such officer or employee to the labor organization in excess of $2,000." VAN ATTA explained this was how union officers and employees were reimbursed for travel expenses. The local union would advance the officer or employee funds not to exceed a $2,000 at any time and settle up the account on a regular basis. There was never any question by VAN ATTA concerning the PLAINTIFF officer's loan balance until NTEU National office president Colleen Kelley (KELLEY) became upset because the PLAINTIFF had made public statements criticizing her leadership which were published by the Washington Post in print and on their web-site along with the web-site FedSmith.com in June 2011.

e. In July 2011, VAN ATTA and KRIEG, through contacts by phone and evidenced by e-mails received from a FOIA request, requested investigations be started on PLAINTIFF. VAN ATTA contacted OLMS and reported PLAINTIFF had stolen union funds, while KRIEG simultaneously contacted upper management in TIGTA to begin investigations on PLAINTIFF for sending an e-mail he believed was in violation of the NTEU-IRS bargaining contract and theft of union funds. The government's agents including KEMP representing OLMS and Gary Mappin representing TIGTA and later MAYES assisted VAN ATTA in reconstructing the

local union's books and records beginning in September 2011 and continuing through at least March 2014, in order to support a pre-determined goal of framing the PLAINTIFF for theft. Despite the fact, the books and records were prepared solely by VAN ATTA contemporaneously when the transactions had occurred, had previously been approved as substantially correct by a CPA, and certified as correct under penalties of perjury by VAN ATTA, KEMP and VAN ATTA conspired to concoct a false narrative based on fraudulent documents, statements, and less than adequate investigative methods.

f. TIGTA wasted thousands of taxpayer dollars by taking into possession on the suggestion of VAN ATTA & KELLEY, a computer owned by NTEU39 and used by PLAINTIFF to perform representational duties under Title 29 U.S.C., and shipped it to the Electronic Crimes and Intelligence Division of the U.S. Treasury Department in Beltsville, MD who in turn performed a digital forensics examination on the hard drive. Upon knowledge and belief, VAN ATTA at the insistence of KELLEY wanted to see PLAINTIFF's union e-mails in order to determine which other chapter leaders across the nation had privately disparaged KELLEY, in order for her to carry out a campaign of vengeance. Further, KRIEG and TIGTA used the analysis as a fishing expedition in order to hopefully find incriminating evidence to be used against PLAINTIFF. TIGTA, after a FOIA request by PLAINTIFF, issued a substantially redacted version of the digital forensics report, which concluded no incriminating information was contained on the hard drive.

g. In the OLMS agent's own interview notes of VAN ATTA held on September 14, 2011 it is stated: "Beginning in October 2010, Van Atta gave PLAINTIFF statements periodically showing how much money PLAINTIFF owed because he wanted the funds put back into the local's account. The last statement that Van Atta issued to PLAINTIFF was in June 2011, but it was not accurate because Van Atta did the statement quickly and had not done a complete analysis. Van Atta kept copies of the statements he gave to PLAINTIFF which contained a list of transactions and sometimes it gave a total. There were some statements where he did not list a total. Sometimes PLAINTIFF provided an explanation for the charges on the statements and sometimes he did not give one. Van Atta provided the statements to PLAINTIFF from October 2010 to June 2011, but he does not recall how many he gave to PLAINTIFF."

h. OLMS agent Sonya Ewing was originally assigned the investigation of the PLAINTIFF and held the initial interview of VAN ATTA on September 14, 2011. Just a few months later, the case was reassigned to agent KEMP who re-interviewed VAN ATTA on March 6, 2012. In this interview, KEMP omits the fact VAN ATTA had regularly issued statements to the PLAINTIFF which reflected the he and PLAINTIFF were communicating fully on disbursements for the local union. KEMP states "VAN ATTA cannot explain why he chose to give PLAINTIFF credit for some of the purchases PLAINTIFF made." KEMP wrote that VAN ATTA repeatedly over the course of two years told PLAINTIFF not to use the chapter's debit card, yet there is not one written document nor e-mail documenting these alleged warnings.

i. Despite the statements from VAN ATTA stating he regularly posted all financial transactions, OLMS and TIGTA agents pursued criminal theft charges against PLAINTIFF. OLMS agent KEMP issued a Report of Investigation (ROI), which stated the PLAINTIFF used NTEU39 debit card more than 81 times and VAN ATTA was unaware of these transactions for over an 18- month time period he was the bookkeeper for NTEU39. Despite these transactions being made on behalf of NTEU39 and none of the expenditures personally benefited the PLAINTIFF, KEMP concluded since VAN ATTA stated he was unaware of them, then they were unauthorized and therefore where evidence of embezzlement by the PLAINTIFF.

8. Notwithstanding the lack of evidence establishing guilt, the criminal case was only dismissed after the government's law enforcement and investigative agents attempted, for almost 18 months to pressure PLAINTIFF into pleading guilty to lesser unfounded misdemeanor charges and then three months of offering to drop all criminal charges if he resigned his employment with the Federal government. The Government's agents unsuccessfully try to strongarm and coerce PLAINTIFF into a plea bargain that would result in the loss of his reputation, in exchange for saving theirs.

9. Upon information and belief, PLAINTIFF alleges the government agents' only "evidence" consisted of contradictory, uncorroborated, unsubstantiated, and fabricated statements of IRS employee VAN ATTA who was also serving as the president of NTEU39 during all relevant times, who asserted that:

a. He and PLAINTIFF had an oral agreement to forego "per-diem" reimbursement from NTEU39. This despite the fact the books and records of NTEU39 in fact showed this was

untrue. Further VAN ATTA, despite being the bookkeeper for NTEU39 had not authorized approximately 81 transactions made by the PLAINTIFF, in his role as executive vice president of NTEU39, over the course of two years.

b. That PLAINTIFF owed NTEU39 approximately $2,400 despite VAN ATTA filing financial statements under penalty of perjury with both OLMS and NTEU National which did not reflect any amounts due to NTEU39 by PLAINTIFF. However, neither OLMS, TIGTA, or the DA20 ever possessed corroborating information. In fact, the small amount of evidence released under the discovery process actually contradicted VAN ATTA's narrative and the basis for the criminal case.

10. Even though the United States government never obtained any actual evidence nor probable cause substantiating the criminal charges that they filed - not from VAN ATTA; not from their own interviews; and not from any other source - it nevertheless prosecuted PLAINTIFF for almost two years before the DA overseeing the case pulled the plug on the political prosecution of PLAINTIFF and dismissed those charges.

11. In addition, the PLAINTIFF had actually provided the Government with exculpatory information and testimony almost eighteen months prior to the indictment by filing a formal complaint against NTEU in May 2012. This complaint alleged non-democratic conduct against him by NTEU falsely accusing him of theft and removing him from his elected position. The PLAINTIFF actually met with OLMS employees Joyln Underwood and Craig Neel, whom are KEMP's first- and second-line supervisors when he filed the complaint. At no time did UNDERWOOD inform the PLAINTIFF she was simultaneously overseeing and directing a criminal investigation of PLAINTIFF all the while, meeting with PLAINTIFF to discuss his complaint against NTEU39 and NTEU

National. At one point during the meeting, UNDERWOOD asked NEAL to discuss PLAINTIFF's Complaint. UNDERWOOD informed PLAINTIFF that NEAL was her immediate supervisor. NEAL and UNDERWOOD questioned PLAINTIFF for approximately two hours and said their office was eager to assist him in pursuing his complaint. UNDERWOOD asked to and received permission from PLAINTIFF to make copies of PLAINTIFF's records in addition to receiving a copy of the complaint and attached exhibits. Additionally, Underwood called PLAINTIFF and met with him for several more hours a few weeks later. From May 2012 until February 2013, UNDERWOOD and PLAINTIFF had several conversations and exchanged e-mails concerning the complaint. In October 2012, PLAINTIFF prepared and provided a copy to UNDERWOOD of a reconstructed travel and per diem schedule along with other documents which showed NTEU39 actually owed the PLAINTIFF $2,574. In addition, PLAINTIFF provided UNDERWOOD with correspondence between he and VAN ATTA which reflected VAN ATTA had directed and authorized the PLAINTIFF to travel for NTEU39 and to use the chapter's debit card to pay for union related expenses. Those same expenses which were later used by KEMP to charge the PLAINTIFF with embezzlement and unauthorized use of a credit/debit card.

12. The indictment and subsequent prosecution of PLAINTIFF was pursued while the United States government's investigative and law enforcement officers and those conspiring with them knew, or should have known, that PLAINTIFF had not committed the alleged crime. The government's investigate and law enforcement officers actually had in their possession direct evidence which contradicted KEMP's Report of Investigation which he relied upon to obtain an indictment against the PLAINTIFF, yet they ignored it because

the facts didn't matter, the train was on the track, and the facts were going to be ignored in order to keep the train running. Although KEMP stated he "purposely have not looked at PLAINTIFF's complaint because it wasn't relevant to my investigation", one of the few items of discovery provided after the PLAINTIFF's indictment were copies of the same documents previously provided to KEMP'S immediate supervisors UNDERWOOD and NEEL.

13. Further, the Government continued its prosecution of PLAINTIFF even after it became, or should have become clear to the United States government's investigative and law enforcement officers and those conspiring with them, their purported witness, VAN ATTA had a history of making false allegations, he was an untrustworthy and unreliable witness, and his allegations were devoid of any reasonable indicia of reliability, and that the Government had no tangible evidence to corroborate his allegations against PLAINTIFF.

14. Ultimately in October 2015, the PLAINTIFF's attorney told DA MILAM he was going to force discovery by filing a complaint with the state judge to force compliance with the PLAINTIFF's discovery request which had gone unanswered for almost 17 months. DA MILAM then decided to retire the criminal charges against the PLAINTIFF for one year. This required no action by the PLAINTIFF other than waiving his right to a speedy trial.

15. On November 30, 2015; almost 18 months after bringing felony criminal charges against PLAINTIFF, forcing him to suffer the emotional distress and humiliation of being charged with two criminal felonies, the fear of long term of imprisonment, and forcing him to sell his house in order to fund his legal costs to defend himself – DA MILAM requested all criminal charges against the PLAINTIFF be retired and filed a motion to

retire the criminal case for twelve months upon which time the indictment against PLAINTIFF would be dismissed. The presiding state judge immediately granted the motion.

16. A few days later, on December 2, 2015 the PLAINTIFF and his wife were granted a divorce which ended their twenty plus year marriage, as the emotional, financial, and mental toll inflicted on PLAINTIFF and his family by the Government's agents malicious conduct over the past two years produced devasting results which will never be overcome or undone.

## COUNT 1: MALICIOUS PROSECUTION

17. Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs above as if fully restated hereinafter.

18. With malice but without probable cause, the Defendant's caused a criminal prosecution to be instituted or continued against the Plaintiff.

19. The criminal prosecution terminated in favor of the Plaintiff.

20. As a direct and proximate result, Plaintiff suffered damages including, without limitation, shame, humiliation, anxiety, personal injuries, loss of time from work, diminished earning capacity in his profession, embarrassment, cost of legal defense and investigation expenses, loss of marriage and family, and attorney's fees paid in the investigation and pursuit of this action.

## COUNT 2: CIVIL CONSPIRACY

21. Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs above as if fully restated hereinafter.

22. Defendants actions constitute a civil conspiracy and as a result the doctrine of joint and several liability is applicable to any judgment Plaintiff is entitled to receive. There is sufficient evidence in this case that there were two (2) or more at fault defendants who, each having the intent and knowledge of the other's intent, accomplished by concert an unlawful purpose, or accomplished by concert a lawful purpose by unlawful means, which results in damage to the Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff is entitled to damages from the United States of America, and pray that a judgment be entered in favor of the PLAINTIFF and against the United States of America as follows:

1. Costs of defending the criminal prosecution and in the amount of $108,500.00; plus

2. Damage to reputation in the amount of $750,000.00; plus

3. Emotional distress, humiliation, and loss of consortium and marriage suffered by the PLAINTIFF in the amount of $1,000,000.00; plus

4. Loss of future earning in the amount of $2,062,500.00; plus

5. PLAINTIFF is further entitled and does hereby seek recovery of all costs and attorney's fee incurred by PLAINTIFF in bringing this civil action; and

6. Any other relief that this Court deems appropriate under the law.

Respectfully submitted,

/s/ Brock East_____
BROCK EAST, #24406
Attorney for the Plaintiff
McCarter | East, PLLC
316 West Main Street
Murfreesboro, TN 37130
615-893-9255
brockeast@mcelaw.com